# CHARLESTON.

## McGINNIS v. SAVAGE.

Submitted January 17, 1887.—Decided February 5, 1887.

1. SALE—CONDITIONAL—PASSING OF TITLE.

If by a contract the owner of personal property transfers the property immediately to another with a condition in the contract, that it is to be paid for by him in instalments at specified times, and that the title to the property is to remain in the original owner, till all the purchase-money has been paid, this is a valid contract between the parties and between them is a conditional sale, and the title to the property as between them does not vest in the vendee upon the delivery of the property, nor until he performs the condition, or the vendor waives it. (p. 366.)

2. SALE—PAYMENT IN LABOR—BREACH—DETINUE.

If in such a contract the payments for the property are to be made in work, and not less than twenty dollars' worth of work at specified prices is to be done by the vendee for the vendor, till the whole price be paid, and the vendee contracts to do not less than twenty dollars' worth of such work in each month as part payment on such purchase, and it is stipulated, that, if this contract is not complied with by the vendee, he is to surrender the property to the vendor,—and the vendee fails in any month to do twenty dollars' worth of work for the vendor, and he demands possession of the property, which the vendee refuses to surrender, the vendor may at once bring an action of detinue for such property against the vendee without waiting, till the time has passed, in which by the terms of the contract all the purchase-money was to have been paid, even though in such contract the property is said to have been hired to the vendee for that length of time. (p. 371.)

3. SALE—EXCHANGE.

If such contract provided, that the vendee might at any time exchange such property for other personal property with the consent of the vendor, and this is done with a prior or subsequent assent of the vendor, he may bring an action of detinue for such property taken in exchange by the vendee, whenever he could have brought an action of detinue for the original property conditionally sold. (p. 375.)

4. SALE—DETINUE—DAMAGES.

In such case the measure of damages for the unlawful detention of such property would be ordinarily the value of the use of the

property from the time, the vendee illegally refused to surrender it to the vendor, until the rendition of the verdict by the jury, excluding any compensation for the use of the property, while the vendee held it legally, and abating nothing from the damages because of payments in work or otherwise made by the vendee to the vendor for the property under the contract.   (p. 376.)

Statement of the case by GREEN, JUDGE :

This was a complaint in detinue brought by George W. McGinnis and Matilda, his wife, before a justice of Kanawha county to recover the possession of one bay horse, about ten years old, of the value of $100.00, one bay mare of the value of $80.00, and two sets of harness of the value of $15.00, and one hay-ladder of the value of $5.00, and for $200.00 damages for the detention of the same. The summons, in which this complaint was stated, was issued October 13, 1885. The case was tried by the justice on October 24, 1885. The plaintiffs appeared as witnesses to sustain their action and produced and proved the agreement between the plaintiffs and defendants hereafter set forth. The defendants produced as witness on their behalf one of the defendants, J. J. Savage. The justice rendered a judgment, that the plaintiffs do recover of the defendants the above described property of the value of $200.00 and one cent damages for the detention of the same and their costs.

From this judgment the defendant obtained an appeal according to law, which was tried by a jury of six on December 8, 1885. The jury rendered a verdict for the plaintiffs, that they do recover of the defendants the property described in the summons, and ascertained the value of this property in the aggregate to be $200.00, but failed to find the value of the several items of property or to assess the damages of the plaintiffs ; and on motion of the defendants this verdict was set aside, and a new trial was ordered, and by leave of the court the plaintiffs amended their summons at the bar ; but the record fails to show what this amendment was. The case was again tried by a jury of six on March 9, 1886, when the jury found the following verdict :

"We, the jury, find that the plaintiffs do recover the possession of the property described in the summons in this

case and ascertain the value of the bay horse to be eighty (80) dollars and the value of the bay mare to be sixty dollars, and the value of the two sets of harness to be ten (10) dollars, and the value of the hay-ladder to be two (2) dollars; and we assess the plaintiffs' damages at two hundred (200) dollars."

The defendants moved the court to set aside this verdict and award them a new trial. The court on March 23, 1886, overruled this motion and rendered a judgment, that the plaintiffs recover of the defendants the possession of all this property above named, if it could be had, and if it could not, its alternate value as found by the jury against the defendants and their security in the appeal-bond with interest on the said valuations severally from the 23d of March, 1886, till paid, and also $200.00, the damages for the detention assessed by the jury, with interest and their costs before the justice of the peace and in the Circuit Court including $10.00 as provided by law. During the progress of the trial the defendant took a bill of exceptions, which sets forth all the facts proven, which were substantially as follows:

The property sued for was owned by the plaintiffs jointly or was property acquired by exchanges made of horses owned by the plaintiffs jointly, which exchanges were made by the defendants with the prior or subsequent consent of the plaintiffs pursuant to the provisions of the written contract hereinafter set forth. The defendants had possession of this property under this contract from its date, and, when the horses were exchanged by them, they had possession under the contract of the horses received by them in exchange for those named in the contract; and it was for this property including the two horses so received in lieu of those named in this contract in exchange, that this suit was brought. The contract referred to is as follows:

"George W. McGinnis, of the city of Charleston, has hereby leased two horses and harness and one hay-ladder for the use and benefit of his wife, Matilda McGinnis, and for the sole use of her one dark bay horse named Frank and one sorrel horse, blind of one eye, named Charley, unto J. J. Savage and his son, M. J. Savage, for the term of ten months, with the understanding that the parties of the second part

bind themselves to take good care of the horses and keep them in good condition; and if the party of the second part should see a good chance to exchange Charley for another horse that would suit them better, they are to let the party of the first part know, that they wish to make such a change, and, with the consent of the party of the first part, such an exchange can be made; and in consideration of the above lease, the parties of the second part bind themselves to furnish to the parties of the first part 700 feet of oak flooring as second class flooring, at second class rates, and 450 feet of ceiling, at mill-rates, exclusive of the hauling, the flooring to be exclusive of the hauling also; and they further bind themselves to go to hauling in logs on the fifth day of January, 1885, and deliver them to the parties of the first part as fast as they can, and they bind themselves to deliver as much as twenty dollars' worth monthly until the sum of two hundred dollars is paid for the above specified horses, harness and hay-ladder, and then the parties of the first part relinquish all claim and bind themselves to give the parties of the second part a clear receipt. The above flooring and ceiling is considered as a bonus to be paid down, but the parties of the second part are to have full credit for the same; and the parties of the second part bind themselves to let the parties of the first part have all logs, that are delivered at Mr. Ward's mill for them, at such prices as logs may be selling at and the mill-man may be paying at the time of the delivery of them. And the parties of the first part bind themselves to take all good merchantable logs of the parties of the second part at mill-prices. And it is further understood that in the event of the death of one or both of the horses by accident or sickness, there is to be no deduction from the two hundred dollars coming to the parties of the first part, but if the parties should fail to comply with the above stipulated contract, then they are to surrender the peaceable possession of all of the above described property, and lose all that they have paid. And it is further understood, that the parties of the first part are to allow the parties of the second part $3.00 per day for all hauling that they may do for them with wagon and horses, and $2.50 per day for breaking up their lots. As witness our hands and seals this the 3d day of January, 1885."

The defendants objected to the reading of this contract to the jury, when it was offered by the plaintiffs; but the court permitted it to be read; and the defendants excepted to this action of the court. The defendants did no hauling as required by this contract except some three or four logs in the early part of January, 1883, and never did in any month hauling to the amount of $20.00 in value, and they paid under this contract on account in all only $38.73, which was paid prior to June, 1883. They never furnished any part of the flooring spoken of in the contract. The plaintiffs at some time not stated in the evidence demanded pay for the horses, which with the plaintiffs' assent had been exchanged by the defendants for the horses named in the contract or the delivery of the possession of the substituted horses; but the defendants refused to pay for them or to deliver up the possession of them or to do hauling for the plaintiffs. The property was proved to be of the value, which the jury ascertained. The use of the property named in the contract or that exchanged for it by the defendants was not less than one dollar per day, and having been held for 243 working days from the time the contract was made to the institution of this suit, it then amounted to $243.00. The suit was instituted October 13, 1885, while the ten months named in the contract did not expire till November 3, 1885, twenty days afterwards.

Upon this evidence the jury found the second verdict in the Circuit Court of Kanawha county, and the court overruled the motion of the defendants for a new trial, and rendered the judgment hereinbefore stated, to which action of the court the defendants excepted and have obtained from this Court a writ of error and *supersedeas* to the judgment.

*Kennedy & Littlepage* and *J. F. Brown* for plaintiffs in error.

*H. C. McWhorter* and *S. C. Burdett* for defendants in error.

Green, Judge:

The first question in this case is:—What is the meaning and legal effect of the contract between the plaintiffs and defendants, copied in the statement of the case, made by

them on January 3, 1885, in reference to the personal prop-
erty the subject of this suit? Although this property
is in the beginning of the agreement stated to have
been leased by the plaintiffs to the defendants, yet the en-
tire agreement shows, that it was no hiring of this property
to the defendants for ten months, as it is said to be in the
beginning of the agreement. One of the clearest indications,
that the parties never designed to hire this property, is that
no hire is stipulated to be paid for its use by the defendants.
It is true, that the defendants do covenant to do hauling for
the plaintiffs, and that they will not do less than $20.00
worth of such hauling in each month, until the sum of $200.00
shall be paid. But this hauling was obviously not to be
done as the hire of the two horses, the harness and hay-lad-
der ; for this agreement expressly says that this " $200.00 is to
be paid for the horses, harness and hay-ladder, and when
thus paid in full, that the plaintiffs were to relinquish all
claim to the property and bound themselves to give the de-
fendants a clear receipt." Though very badly expressed the
meaning of this would seem to be clear, that, when the de-
fendants should have paid in labor to the plaintiffs the value
of this property estimated at $200.00 in payments of not less
than $20.00 per month, then the plaintiffs would make to
them a good title to this property, and that in the mean time
the defendants should have the possession of but not the
title to the property.

There is, it is true, a rather singular provision inserted in
this agreement, and one, which may like the *leasing* pro-
vision in the beginning of the agreement seem at first sight
to be inconsistent with the interpretation above given. The
provision is:—"And it is further understood, that in the
event of the death of one or both of the horses by accident or
sickness there is to be no deduction from the $200.00 coming
to the plaintiffs ; but if the defendants should fail to com-
ply with the above stipulated contract, they are to surren-
der the peaceable possession of the property and lose
all they have paid." The fact, that the death by acci-
dent or sickness of either horse should be the loss of the
defendants, does not seem to consist with what seems to
be clearly the meaning of the contract, that the title to the

horses should remain with the plaintiffs, till the $200.00 in work should be paid by the defendants in full ; or it would seem to be a very unreasonable advantage conferred on the vendors.   But this clause could hardly control the clear meaning of the contract, especially as it seems to be an independent clause in the contract; and while it puts on the defendants the burden of running the risk of the horses dying before the expiration of the ten months, the plaintiffs requiring the defendants if one horse should die to pay $200.00 for the other; and if they failed to comply with their agreement of paying for the property at the rate of $20.00 per month till the whole was paid for, they would surrender the property and lose all they had paid.   Yet, as if to offset these unreasonable provisions, there was in this portion of the agreement some compensation to the defendants for the harshness of these stipulations.   In the first place, as there is no stipulation for the hiring of this property at any named price, the conclusion to be drawn would seem to be, that, if the defendants paid the $200.00 in labor, as stipulated for in the contract, they were to have title to the property without paying anything to the plaintiffs for the use of the property under this contract ; and, if they failed to pay the plaintiffs $20.00 a month in labor for ten months, the plaintiffs might demand of them the surrender of the property, the title to it still being in the plaintiffs; and as the defendants were to pay no hire, so the plaintiffs were to refund nothing, which might have been paid on the property ; and if the defendants should fail to pay as much, as the hire of the property might be worth, and the plaintiffs should not demand possession of the property promptly, the result would seem to be, that the defendants in such case would have the use of the property for less than the use of it was worth.   But, as the plaintiffs could have resumed possession of this property at the end of any month, in which the defendants failed to pay them at least $20.00 in work, it is obvious, that the plaintiffs had it in their power to save themselves from all loss in the transaction.

It is true, that a provision of this character placing the risk of the death of the property on one of the parties to the

agreement, has in some cases been regarded as important in determining and throwing light upon the character of the transaction and the true meaning of the agreement. As to the influence of such a provision upon a contract, see the following cases, no one of which however bears much resemblance to the case before us :—*Harrison* v. *Lee*, 1 Litt. (Ky.) 191; *Gray* v. *Pruther*, 2 Bibb 223; *Berry* v. *Glover*, 1 Harp. Eq. (S. C.) 153; *Bishop* v. *Rutlege*, 7 J. J. Marsh. 217; *Hart* v. *Barton*, Id. 322; *Stone* v. *Weltis*, 4 B. Mon. 496; *Williams* v. *Cheathem*, 19 Ark. 278; *Johnson* v. *Clark*, 5 Ark. 321; *Brown* v. *Bennett*, 8 Johns. 96. But whatever effect or construction might be given to this provision of the contract, if this was a suit on the contract, there is nothing in it to prevent us from regarding this contract as for the sale of personal property, the possession of which was to be delivered to the vendees immediately, and which was so delivered, but the title thereto was not to vest in the vendees, till they had complied with a condition precedent, that is, till they had paid all the purchase-money.

Contracts of this character have in recent years become very common in many States of the Union; and they have been the occasion of much litigation. Such a contract was very obviously not designed by the parties to it to be a chattel-mortgage. Their obvious purpose was to put their contract in a form, in which it should not be regarded as an absolute sale of the property but as a conditional sale, the title to remain in the vendor, till the condition should be performed, and at the same time the parties evidently intended, that the contract should not be regarded as a mortgage to secure the price of the property, as if absolutely sold and delivered.

When the contract is in reference to real estate, it is frequently difficult to determine, whether it constitutes an absolute sale or a conditional sale or a mortgage; and in determining, which of the three it is, the court habitually looks beyond the mere wording of the contract to the circumstances surrounding the parties, at the time they made it, and their real object and purpose,—frequently holding the transaction to be a mortgage, when the wording of the contract shows, that it was the design of the parties to

give to the transaction the appearance of not being a mort-
gage. ( *Vangilder* v. *Hoffman*, 22 W. Va. 2, pts. 6 and 7 of
syll.; *Hoffman* v. *Ryan*, 21 W. Va. 415; *Davis* v. *Demming*,
12 W. Va. 281).

Upon the principles governing in these cases the contract
before us should be regarded as a conditional sale, not as a
mortgage. Yet some judges have been disposed to regard
such a contract as this as a chattel-mortgage, even when
worded as a conditional sale. They have been disposed to
regard the delivery of the property to the purchaser as com-
pleting the sale; but, the sale being thus completed, the
provision, that the title shall be retained by the vendor till
the vendee pays the whole of the purchase-money, they
think, should be regarded as a retention of a lien upon the
property to secure the purchase-money, that is, that the ven-
dor has in substance and really by such a contract sold the
property absolutely and has taken a mortgage on it to secure
the purchase-money. This was the view, for instance, taken
by Manning. Judge, in *Dudley* v. *Abner*, 52 Ala. 572. There
is no doubt, that by so holding many troublesome questions
would be avoided. Some of these questions, which must
arise, if such contracts are regarded as conditional sales are
referred to in Judge Manning's opinion, 52 Ala. 578 *et seq.*
Among the troublesome questions, which have not even
been considered in this State are such as the following:—If
the vendor for the failure on the part of the vendee to pay
the price stipulated at the time specified under the provis-
ions of the contract takes possession of the property, can he
dispose of it, as he pleases, and at the same time hold and
enforce against the vendee the claim for the hire of the prop-
erty ? Can he maintain an action against the vendee for dam-
ages, when he fails to comply with his contract ? Does
the contract, when the vendor re-possesses himself of the
property become void?—As touching questions of this char-
acter see *Preston* v. *Whitney*, 25 Mich. 267. Or if the ven-
dee has made payment of a large part of the purchase-
money, shall the vendor, who under the provisions of the
contract has re-possessed himself of the property, because
the vendee has failed to comply with the terms of the con-
tract, be required to re-pay such partial payments to the ven-

dee? See on this question *Home Sewing Machine Co.* v.
*Willie*, 85 Ill. 333; *Latham* v. *Summer*, 89. Ill. 234; *Preston* v. *Whitney*, 23 Mich. 260; *Hine* v. *Roberts*, 48 Conn.
268.

But a much more serious difficulty very often results from
holding such contracts to be conditional sales. If regarded
as mortgages, of course they would be void as against inno-
cent purchasers for valuable consideration without notice
and against attaching creditors of the vendee or creditors,
who have obtained judgments against him and by issuing
executions have acquired liens on the property as the prop-
erty of the vendee, unless the chattel-mortgage has been
duly recorded in the proper office under recording statutes,
which exists in all the States. But if on the other hand
such contracts are regarded as conditional sales, then, as
they are not by the terms of these recording statutes re-
quired to be recorded in many of the States, where such
contracts are held to be conditional sales, as a consequence
thereof it is held, they are good though unrecorded against
innocent purchasers for valuable consideration of the ven-
dee, though they had no notice that the vendee having pos-
session of the property as owner was not the legal owner
because of his failure to comply with some condition in the
sale, as the payment of the purchase-money. It is also held,
that such conditional sales unrecorded are valid as against
attaching creditors and all other creditors of the vendee.
These contracts are thus regarded as conditional sales and
valid not only as between the parties but also as against all
others in many of the States. This is held to be the law in
Massachusetts, New Hampshire, Connecticut, Indiana, Mis-
souri, Michigan, Vermont, Maine and Iowa.

But to avoid the obvious mischiefs, which flow from hold-
ing, that such contracts are conditional sales valid not only
between parties but also as against all other persons,
several of these States have passed statutes requiring
such conditional sales to be recorded, before they shall
be valid against purchasers for valuable consideration
without notice and creditors of the vendee. Such statutes
have been passed in Maine, Vermont and Iowa. But
in some of the States it has been held, that such con-

tracts, while they must be regarded as conditional sales and as valid between the parties, are independent of any recording statutes by the common-law fraudulent and void as against innocent purchasers for value without notice and creditors of the vendee. This is held to be the case by the decisions in New York, Alabama, Illinois, Kentucky and Pennsylvania. In some of these States nice distinctions are taken between conditional sales void as to innocent purchasers and creditors of the vendee in possession and contracts of bailment only with an executory conditional agreement for the purchase of the chattel. In such a case it has in some instances been held, that, if the condition has not been performed, no title can be acquired by an innocent purchaser from the bailee.

In view of these numerous difficulties, which arise from holding these contracts to be conditional sales and not chattel mortgages, occasionally a judge has expressed regret, that the law was so settled. Thus in *Haines* v. *Cherry*, 23 Hun (30 N. Y.) the court says :—" It is to be regretted, that courts have held, that, what are improperly called conditional sales, are valid. The doctrine, that in a sale of personal property there can be a delivery, and yet the vendor can retain title, is an evasion as to the statute of mortgages of personal property and is contrary to good policy and sound principle. But it is the law of the State. "

But the greatest evil resulting from the holding of these contracts to be valid conditional sales is avoided, when, as is the case, we have seen, in a number of the States, such sales are held invalid against purchasers for value from the vendee without notice of the condition and against creditors of such vendee in the actual possession of the property. The views of the courts, who so hold, are tersely and distinctly stated in *Martin* v. *Mathiot*, 14 Serg. & R. 215 (16 Am. Dec. 491) by Chief Justice Tilghman. He says :—" Possession of personal property is the great mark of ownership. It is almost the only index, which the world in general has to look to. But there are exceptions. There are certain necessary and lawful contracts, by which the owner parts with possession, and yet fraud can not be presumed. Such are the contracts of lending and hiring, both very useful, and with-

out which society could not well exist. It is of the essence of these, that the owner should give up the possession for a time. Such too are contracts, by which an artisan or manufacturer has the possession of materials belonging to another for the purpose of making them up or repairing them for the owner. No suspicion of fraud can fairly arise, where the transaction is in the usual course of business. But the case is very different, where it is intended, that the property should be apparently in one, while it is in fact in another. This is out of the usual course of business unnecessary and directly tending to the injury of those, who are not in the secret. In the present instance for example there was a sale of four horses and harness, and possession delivered to a man, who got his living by the use of his team. All the world has a right to suppose, that he was the owner of the horses, which he drove, and a secret agreement to the contrary was an injury to society by giving the wagoner a false credit, which might induce others to trust him with their property. The cases, which have generally been brought before courts of justice, are those, in which the seller has remained in possession. Those have been adjudged fraudulent. * * * *. The principle, which governed them, was, that a sale, where possession does not accompany and follow it, is fraudulent as to creditors. It was the separation of the possession from the property, which made the fraud ; and the principle applies to the case before us. Here the seller did not retain the possession, but was to retain the property, after he had transferred the possession to the buyer. The mischief is the same—a false credit is given, and whether given to the buyer or seller is immaterial. ''

But these views have not been adopted in many of the States; and in many of them, we have seen, such conditional sales have been held valid as against purchasers and creditors of the vendee. But in the case before us no question arises as to the effect of such a contract upon either an innocent purchaser or a creditor of the vendee. It is simply a question between the original parties to the contract ; and though the validity of such a contract as a conditional sale even between the original parties to the contract has been

questioned, yet both upon reason and the overwhelming weight of authority I must regard such a contract valid between the parties to it and as a contract for the sale of property with a condition precedent, and therefore, though the property was delivered to the vendees, the title did not vest in them as purchasers, till they had performed the condition precedent. This is sustained by the authorities with scarcely an exception. ( *Clark* v. *Jack,* 7 Watts 375; *Chamberland* v. *Smith,* 44 Pa. St. 431; *Harvey* v. *Locomotive Works,* 95 U. S. 664; *Greer* v. *Church,* 13 Ky. 430; *Chissolm* v. *Hawkins,* 11 Ind. 316; *Thomas* v. *Winters,* 12 Ind. 322; *Preston* v. *Whiting,* 23 Mich. 266; *Latham* v. *Summer,* 89 Ill. 234; *Flick* v. *Warner,* 25 Kans. 492; *Hine* v. *Roberts,* 48 Conn. 268; *Stadtfield* v. *Man'g Co.,* 92 Pa. St. 52; *Lucas* v. *Campbell,* 88 Ill. 447; *Story* v. *Taylor,* 2 Hill 326; *Higler* v. *Eddy,* 53 Cal. 597; *Joines* v. *Blundy,* 58 Ga. 379; *Brown* v. *Moss,* 70 N. Y. 475; *Barrett* v. *Pilchard,* 2 Pick. 513; *Sands* v. *Reber,* 28 Ohio St. 630.)

Many other authorities sustaining these views might be cited; for on this point there is scarcely any diversity of opinion. In the opinions, which I have cited above, the contract declared to be a conditional sale and valid between the parties is generally set out at length; and an examination of them will show, that anywhere in the United States the contract in this case would be held to be valid between the parties and a conditional sale, in which the title to the property named in the contract never did vest in the vendees, because the condition precedent, upon which the title was to vest, was never performed. It is not uncommon, as in this case, for parties to word such conditional sale, as though it was a leasing or hiring of the property; the object frequently being to make such conditional sale valid not only between the parties but also, if possible, against innocent purchasers from and creditors of the vendee. Of such a case the Supreme Court of the United states in *Harvey* v. *Locomotive Works,* 93 U. S. 672, say:—" The transaction is not changed by the agreement assuming the form of a lease. In determining the real character of a contract courts will always look to its purpose rather than to the name given to it by the parties. If that purpose be to

give the vendor a lien on the property until payment in full of the purchase money, it is (in Illinois) liable to be defeated by creditors of the purchaser in possession of it. This was held in *Marsh* v. *Wright*, 46 Ill. 488. In that case the purchaser took from the seller a piano at the price of $700.00, paying $50.00 down, which was called rent for the first month. and agreeing to pay as rent $50.00 each month, until the whole amount should be paid, when he was to own the piano. The court held, that it was a mere subterfuge to call this transaction a lease; and that it was a conditional sale with the right of rescission on the part of the vendor, if the purchaser should fail in payment of his installments,—a contract legal and valid as between the parties."

That case is in this respect like the one before us. Other cases might be cited, where, although contracts of this character were drawn in the form of leases, the courts held them to be conditional sales. (*Greer* v. *Church*, 13 Bush 430; *Hine* v. *Roberts*, 48 Conn. 267; *Lucas* v. *Campbell*, 88 Ill. 447.)

This contract being, as we have seen, a conditional sale, did the vendors, when the condition, upon which the title was to vest in the vendees, was violated, and when by the terms of the agreement the vendors were to surrender the property including the two horses, have a right to insist on the surrender of the two horses, which had been received by the vendees in exchange for the two horses named in the agreement with the assent of the vendors, as, it was expressly stipulated in the agreement, might be done? I can not see how the right of the vendors to demand the surrender of these two horses can be disputed; for if they were as much the property of the vendors, after the exchange was made, as were the horses named in the agreement; and as the vendees had failed to perform the condition, on which they could have acquired title to them, and on which alone they could claim any right to their possession, they had no right longer to hold them but were bound to surrender them on the demand of the true owners. The fact, that the vendees exchanged one of the horses named in the agreement, before first consulting the vendors, as they were required to do by the

agreement, can not vary the case, as the vendors subsequently assented to the exchange. It seems to me, that the words—"if the parties should fail to comply with the above stipulated contract, they are to surrender the peaceable possession of the above described property"—must be interpreted so as to give the vendors a right to demand of the vendees the surrender of the property, whenever the vendees should fail to do for the vendors twenty dollars' worth of hauling monthly. It also seems to me, that the vendees "failed to comply with the above stipulated contract, " so soon as they failed to do twenty dollars' worth of hauling in any one month ; and that the vendors were not bound to wait for ten months after the contract was made, if the vendees should in this manner fail to comply with the contract, before they could demand the peaceable surrender of the property.

On the other hand it is obvious, that this privilege of demanding the surrender of the property was intended for the benefit and protection of the vendors ; and they could of course waive the right. By their own evidence it appears, that they did waive it for several months ; for, as they themselves testify, they accepted payment under this conditional sale as late as May, 1885, between four and five months after the contract was made, and after it had been broken by the vendees. Though it does not appear, when the vendors made a demand on the vendees either for the pay for or the surrender of the horses, or when the vendees positively refused to comply with the contract, I presume it was but a short time before the institution of this suit. From the date of this demand and refusal (and not before) the vendors had a right to bring this action. Up to that time they recognized the right of the vendees to keep the horses, if the $200.00 should be paid in the manner stated in the agreement; they recognized this agreement as still in force and operative ; and this being so, the possession of the horses and other property by the vendees up to that time was not wrongful, and no damages can be demanded for their detention prior to that time. If this had been an action of trover for the conversion of this property by the vendees to their own use, the true measure of damages would

have been the value of the property, proven to have been $200.00, with interest thereon from the time of the conversion, when the vendees refused to give it up and declined to make any arrangement for paying therefor. In such an action the vendees could not reduce the damages by abating the payments, which they might have made, nor could the vendors increase the damages by the value of the hire of the property while in the vendees' possession. This, which seems to me self-evident, was decided in *Angier* v. *Man'g Company*, 1 Gray 621.

In *Flesh* v. *Warner*, 25 Ran., an action of replevin for a safe, which had been sold conditionally in a manner entirely similar to the conditional sale in this case, it was held, that the vendor had a right to demand and take possession of the safe on failure of the vendee to comply with the condition by making all the payments without paying back or tendering any portion of the amount paid to him by the vendee. In that case the court expressly waives the consideration of the question, whether the defendant might or might not recover the whole or some part of the amount in some other action. This decision seems to me to be clearly right and to apply as well to an action of detinue as to an action of replevin. The defendants in the case before us have no right to abate the damages, which the plaintiffs may recover, by proving the amount, which they have paid under the written agreement; and it is equally obvious, that the plaintiffs can not increase the damages, which they may be entitled to recover, by proving what the hire of the horses and the use of the other property were worth for the time said horses and property were in the possession of the defendants.

In the case of *Brown* v. *Haynes*, 52 Me. 578, which was an action of trover for the recovery of cattle sold by the plaintiff conditionally, only half the purchase-money having been paid at the time stipulated for the full payment, the measure of damages was the value of the cattle at the time and place of conversion with interest from that date without any deduction for the partial payment or any enhancement for use of the cattle. This decision accords with *Angier* v. *Man'g Company*,

48

1 Gray 621. Appleton, Chief Justice, says in that case, that the defendant can not recover any part of what he has paid. "Failing to perform his agreement the purchaser can derive no benefit from a partial performance." This is of course but an *obiter dictum* in the case, except so far as it holds, that no abatement of damages can be made because of partial payment. These cases were followed in *Casto* v. *Kingman*, 103 Mass. 517, and in *Colcord* v. *McDonald*, 128 Mass. 470. If therefore the plaintiffs in this case had brought the equivalent of an action of trover, the measure of damages would be simply the interest on the value of the property from the time of the refusal of the defendants to surrender it under the terms of the agreement to the time of the trial. For in this form of action the plaintiffs would elect to treat the wrongful act of the defendants in refusing to deliver up the property as a conversion, and thereby declare, that by such conversion the title passed to the defendants. Of course, therefore, the title having passed to the defendants, the plaintiffs could not claim for the use of it as if it were still their own property.

But instead of bringing an action in the nature of trover the plaintiffs in the case before us brought an action in the nature of detinue choosing to treat the property not as converted but as unlawfully detained, and claimed the property itself or, if it could not be had, its alternative value. Whether they obtain the property or its value, they can claim the damages for its unlawful detention, which are in such case as in replevin the hire of the horses and other property from the time of the refusal to deliver them up till the time of trial. For in the action of detinue the damages for the detention begin, when the unlawful possession begins, and continue to the trial, or till the plaintiffs' title to the property ceases, when this occurs before the trial; and their measure is such a sum, as will compensate the plaintiff for the unlawful detention, in such a case as this the hire of the property from the time the defendants refused to deliver it up on the demand of the plaintiff till the trial. (*McGaroch* v. *Chamberlain*, 20 Ill. 219; *Gardner* v. *Booth*, 31 Ala. 186; *Whitfield* v. *Whitfield*, 44 Miss. 254).

Of course in the case before us the jury could not properly

consider as increasing the damages to be rendered in favor of the plaintiff the fact, that the hire of the property, while it was in the defendants' hands, was worth probably more than what was paid by the defendants to the plaintiffs. In estimating their damages, they have nothing to do with the amount paid by the defendants on the property nor with the value of the use of the property to the defendants, while they held it under the agreement. The true measure is the hire of the property from the time of the refusal of the defendants to deliver it up on the demand of the plaintiffs, which, I presume, was but a short time before the institution of this suit, though it does not appear, when it was.

It is obvious from the verdict rendered by the jury, that they estimated the hire of the property from January 3, 1885, when the defendants took possession of it under the agreement, and subtracted that from the amount paid by the defendants on the property, thus giving a much greater amount of damages to the plaintiffs, than they were entitled to. They erred too in their mode of estimating the hire of the horses; for while it is doubtless true, as testified in the case, that the two horses were worth one dollar a day for farm-work, when hired for a day or for a few days, yet such evidence did not justify the jury in concluding, as we may judge from their verdict they did, that the horses were worth a dollar a day, when hired by the year. This led the jury to, what appears to me to be, a very absurd conclusion, that the hire of two horses worth $140.00 was for probably less than a year's time $200.00. If a man hires a horse by the day, he charges fifty cents or perhaps a dollar a day for it, because, when it is not hired out, he has to keep and feed it at a heavy expense; but he would not think of charging $150.00 to $300.00 a year for its hire, though that would be at the same rate per day; for when hiring by the year he is free from the expense of keeping it for a whole year.

For the reasons assigned we conclude, that the plaintiffs had a right to institute this action on October 13, 1885, and were not bound to delay their suit, till ten months should have passed after the making of the agreement, that is, till November 3, 1885;—that they had upon the evidence the right to recover the horses sued for, though they were not

the horses named in the agreement between the plaintiffs and the defendants, but were horses, which under this agreement had been obtained in exchange for those named therein, as in said agreement such exchange was provided for;—that the said contract in writing was properly admitted by the court to be read in evidence to the jury;—that the court below in the judgment of March 23, 1886, properly set aside the judgment, which through mistake had been entered on the verdict of the jury, after a motion to set aside said verdict and award a new trial had been made, but before it had been acted upon;—that the court below erred in overruling the motion made by the defendants for a new trial and in refusing to set aside the verdict of the jury and in entering up a judgment on said verdict, as the amount of the damages awarded by the verdict shows clearly, that they rendered their verdict under a misapprehension of the true measure of damages in such a case.

For these reasons the judgments of the Circuit Court of Kanawha county rendered on the 9th day of March, 1886, and on the 23d day of March, 1886, must be set aside, reversed and annulled, and the plaintiffs in error must recover of the defendants in error their costs in this Court expended ; and this Court proceeding to render such judgment, as the court below should have rendered, doth set aside the verdict of the jury rendered on the 9th day of March, 1886, and doth award to the defendants a new trial, the costs of the former trial to abide the result of the suit; and the case must be remanded to the Circuit Court of Kanawha county to be proceeded with according to the principles laid down in this opinion and further according to the principles governing courts of law.

Reversed. Remanded.